UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CHRISTOPHER ROSS,

                                        Plaintiff,

              v.                                                      9:18-CV-0039
                                                                      (GLS/TWD)

BRANDON SMITH, et. al.,

                                        Defendants.

_____

APPEARANCES:

CHRISTOPHER ROSS
Plaintiff pro se
30 Oak Street
Port Chester, NY 10573


HON. LETITIA JAMES                          MARK G. MITCHELL, ESQ.
New York State Attorney General             Ass't Attorney General
Attorney for Defendants
Litigation Bureau
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

       Plaintiff commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 in

January 2018.  (Dkt. No. 1.)  In the March 19, 2018, Decision and Order of the Hon. Gary L.

Sharpe, Senior U.S. District Judge, Plaintiff was granted *in forma pauperis* ("IFP") status.  (Dkt.

No. 9 at 2.[1])  In the same Decision and Order, Judge Sharpe dismissed Plaintiff's complaint on

initial review under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  Plaintiff was granted leave to

amend his Eighth Amendment medical indifference claims against Defendants Nurse

Administrator Cole ("NA Cole") and Dr. Smith, and his supervisory liability claim against

Superintendent Smith with respect to his medical indifference claims.  *Id.* at 16.

Plaintiff filed an amended complaint on June 4, 2018, and Judge Sharpe accepted

Plaintiff's Eighth Amendment medical indifference claims against NA Cole, Dr. Smith, and

Superintendent Smith for filing and required a response.  (Dkt. Nos. 16; 17 at 17-18.)  The

summons and amended complaint were served on the three Defendants on August 15, 2018, and

Defendants thereafter filed a motion to revoke Plaintiff's IFP status under the three strikes rule

and dismiss his amended complaint for failure to pay the filing fee.[2]  (Dkt. No. 24.)  Plaintiff has

not opposed the motion.  For reasons explained below, the Court nonetheless recommends that

the motion be denied.

## DISCUSSION

28 U.S.C. § 1915(g), often referred to as the "three strikes" rule, provides:

> In no event shall a prisoner bring a civil action . . . under this
> section if the prisoner has, on 3 or more prior occasions, while
> incarcerated or detained in any facility, brought an action or appeal
> in a court of the United States that was dismissed on the grounds
> that it is frivolous, malicious, or fails to state a claim upon which
> relief may be granted, unless the prisoner is under imminent danger

---

[1]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2]  According to the docket, Plaintiff is no longer incarcerated.  (Dkt. No. 30.)  Inasmuch as Plaintiff was a prisoner when he commenced the present action, the three strikes rule still applies.  *See Harris v. City of N.Y.*, 607 F.3d 18, 22 (2d Cir. 2010).

of serious physical injury.

28 U.S.C. § 1915(g).  The manifest intent of Congress in enacting this "three strikes" provision was to deter the filing of multiple, frivolous civil rights suits by prison inmates.  *Tafari v. Hues,* 473 F.3d 440, 443-44 (2d Cir. 2007) (citing *Nicholas v. Tucker*, 114 F.3d 17, 19 (2d Cir. 1997)).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  To determine whether a dismissal satisfies the failure to state a claim prong of 28 U.S.C. § 1915(g), courts look to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Tafari*, 473 F.3d at 442.  The question of whether the dismissal of a prior action constitutes a strike for purposes of § 1915(g) is a matter of statutory interpretation, and as such a question for the Court.  *Id*.

In support of their three strikes motion, Defendants have identified three lawsuits previously brought by Plaintiff which they claim were dismissed as frivolous or for failure to state a claim.  They are *Ross v. Westchester County Jail, et al.*, No. 1:96-CV-2434 (S.D.N.Y.) ("Action No. 1"); *Ross v. New York Correct Care Solutions, et al.*, No. 1:12-CV-3249 (LAP) (S.D.N.Y.) ("Action No. 2"); and *Ross v. Westchester County Jail*, et al., No. 1:10-CV-3937 (S.D.N.Y.) ("Action No. 3").

The docket for Action No. 1, which Plaintiff commenced in 1996, reveals that it was dismissed as frivolous under 28 U.S.C. § 1915(d) and therefore can be found to constitute a

strike for purposes of the three strike rule (Dkt. No. 24-2 at 2-3.)[3]  The Court finds, however, that neither Action No. 2 nor Action No. 3 constitutes a strike.

The Hon. Loretta A. Preska, at the time Chief U.S. District Judge in the Southern District of New York, dismissed Action No. 2 because Plaintiff had raised essentially the same claims as he had raised in another lawsuit pending in the Southern District of New York, *Ross v. New York Correct Care Solutions*, No. 11 Civ. 8542 (DLC) (S.D.N.Y. November 21, 2011).  In her Order of Dismissal, Judge Preska dismissed the action without prejudice as duplicative of the pending action and wrote that because Plaintiff may not have understood that he could have requested leave to amend the complaint in the pending action, the Clerk of the Court would not charge him the $350.00 filing fee, and he could seek leave to amend his complaint in the initial action.  (Dkt. No. 24-3 at 3.)  This Court has reviewed the docket sheet in No. 11 Civ. 8542 (DLC), the duplicative action, and discovered that far from being a frivolous lawsuit, it was one in which Plaintiff obtained a settlement prior to trial.  *See Ross v. New York Correct Care Solutions*, No. 11 Civ. 8542 (DLC) (S.D.N.Y.) (Dkt. Nos. 82 and 83.)

In Action No. 3, Plaintiff's claim for deliberate indifference to his serious medical needs against Westchester County was found sufficient to state a claim.  *See Ross v. Westchester County Jail*, No. 10 Civ. 3937 (DLC), 2012 WL 86467, at *5 (S.D.N.Y. Jan 11, 2012).[4]  The litigation continued thereafter through to the defendants' successful summary judgment motion.

---

[3]  During the relevant time period, 28 U.S.C. § 1915(d) authorized a court to dismiss an action in which the plaintiff applied for IFP status "if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious."  *Blake v. Bentsen*, No. 95 CV 2227 (SJ), 1995 WL 428694, at *1 (E.D.N.Y. July 11, 1995).

[4]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

*See Ross v. Westchester County*, No. 10 Civ. 3937 (DLC), 2013 WL 5178354, at *8 (S.D.N.Y. Sept. 16, 2013). The Court finds that a subsequent determination by the Court of Appeals dismissing Plaintiff's appeal on the grounds that the appeal lacked an arguable basis in law or fact (Action No. 3, Dkt. No. 102), does not render the action itself, which was found to state a claim on a Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, frivolous for purposes of the three strikes rule.

Based on the foregoing, the Court recommends that Defendants' motion to revoke Plaintiff's IFP status under the three strikes rule and dismiss his amended complaint for failure to pay the filing fee (Dkt. No. 24) be denied.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to revoke Plaintiff's IFP status under the three strikes rule and dismiss his amended complaint for failure to pay the filing fee (Dkt. No. 24) be **DENIED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5] Such objections shall be filed with the Clerk of the

---

[5] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  July 8, 2019
        Syracuse, New York

                                         Therese Wiley Dancks
                                    United States Magistrate Judge

Blake v. Bentsen, Not Reported in F.Supp. (1995)

1995 WL 428694

Case 9:18-cv-00039-GLS-TWD   Document 33   Filed 07/08/19   Page 7 of 25

1995 WL 428694
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ernestine BLAKE, Plaintiff,

v.

Lloyd M. BENTSEN, Secretary
of the Treasury, Defendant.

95 CV 2227 (SJ).
|
July 11, 1995.

**Attorneys and Law Firms**

Ernestine Blake, Bronx, NY, plaintiff pro se.

Zachary W. Carter, U. S. Atty., E. D. of N. Y., Brooklyn, NY, not appearing, but being the for defendant.

MEMORANDUM AND ORDER

JOHNSON, District Judge:

INTRODUCTION

**\*1** Plaintiff *pro se,* Ernestine Blake ("Plaintiff"), brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* According to Blake, her employer, the Internal Revenue Service, Brooklyn District Office, is harassing her and retaliating against her for the complaints she has filed against it with the Equal Employment Opportunity Commission and in federal court. The alleged retaliation, which began on or about July 26, 1994, consists of (1) assigning to her an "unmanageable inventory" (Compl. at 4); (2) denying a request for an extension of time to process a large volume of assigned work; and (3) denying a request to conduct an expeditious review of the assigned work in order to expedite the processing of same.

Before this Court is Plaintiff's application for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a). For the reasons stated below, the motion to proceed *in forma pauperis* is denied and the case is dismissed pursuant to 28 U.S.C. § 1915(d).

BACKGROUND

The instant case is the sixth action filed by Plaintiff in this Court against the same defendant and alleging common causes of action. Plaintiff is alleging that her employer, the Internal Revenue Service ("IRS"), has been discriminating against her by, among other things, giving her an unmanageable caseload, retaliating against her for the filing of her complaints against the IRS and engaging in acts that amount to "systematic harassment." (Compl. at 2.)

The lead case is proceeding under docket number 89 CV 2292; three of the other cases (92 CV 2747, 94 CV 1014, and 94 CV 1704) have been consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. The fifth case, docket number 95 CV 94, was filed on January 9, 1995 and is currently pending. Accompanying Plaintiff's complaint in this action is an application to proceed *in forma pauperis.* The allegations made by Plaintiff in this action are virtually identical in substance to the allegations made in the cases which have been consolidated under the lead case.

DISCUSSION

Section 1915 of Title 28 of the United States Code authorizes a court to dismiss sua sponte a case in which the plaintiff has applied for *in forma pauperis* "if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d). The underlying purpose of this statute is to ensure that litigants are not denied access to the federal courts because of their financial circumstances. *Neitzke v. Williams,* 490 U.S. 319, 324 (1989). Congress also recognized, however, that a litigant who is not required to pay court costs or attorneys' fees may be inclined to abuse this privilege by filing meritless claims. To prevent such abuse, the statute specifically authorizes the court to dismiss, *sua sponte,* complaints that are either frivolous or malicious.

The Second Circuit has adopted a two-step approach for disposing of claims brought under section 1915: (1) financial eligibility; and (2) a determination of whether the claim is frivolous or malicious. *See Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983).

1995 WL 428694

**\*2**  In the instant case, this Court finds that Plaintiff does not meet the indigency standards of 28 U.S.C. § 1915(a). Thus, Plaintiff's motion to proceed *in forma pauperis* is denied.

Moreover, this action is subject to dismissal under 28 U.S.C. § 1915(d). A decision to dismiss an action pursuant to § 1915(d) must be informed by a liberal construction of *pro se* pleadings. This lenient construction notwithstanding, duplicative or repetitious litigation of virtually identical causes of action is subject to dismissal under § 1915(d) as malicious. *Bailey v. Johnson,* 846 F.2d 1019, 1021 (5th Cir. 1988). "[A]n IFP complaint that merely repeats pending or previously litigated claims may be considered abusive and dismissed under the authority of section 1915(d)." *Id.* Since Plaintiff's previously filed actions raise identical questions of fact and law as the instant action, this Court, in its discretion, finds that the instant action should be dismissed as abusive under § 1915(d).

Plaintiff is cautioned that the further filing of duplicative complaints may result in the issuance of an order barring the acceptance of any future complaints for filing in this Court without prior leave. 28 U.S.C. § 1651.

CONCLUSION

For the reasons set forth herein, Plaintiff's motion to proceed *in forma pauperis* is DENIED. This action is DISMISSED pursuant to 28 U.S.C. § 1915(d). The Clerk of the Court is advised that this decision closes the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 428694

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 86467
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Christopher ROSS, Plaintiff,
v.
WESTCHESTER COUNTY JAIL, Westchester
County Department of Corrections Medical
Department, Warden Anthony Amicucci,
Captain Ray Rhodes, Captain Soychek, Sergeant
Martinez, Sergeant Schmidt, Sergeant Del
Treste, Sergeant Bell, Sergeant Woods, Sergeant
Coley, Sergeant MaCcabee, Officer Burges,
Medical Liaison June Yozzo, Defendants.

No. 10 Civ. 3937(DLC).
|
Jan. 11, 2012.

**Attorneys and Law Firms**

Christopher Ross, Valhalla, NY, pro se.

Christine Lynne D'Alessio Assistant County Attorney
Westchester County Attorney's Office, White Plains, NY,
for defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff Christopher Ross ("Ross"), proceeding
*pro se,* brings this action pursuant to 42 U.S.C. §
1983 for injunctive relief and compensatory damages
against the Westchester County Jail ("Jail"), the
Westchester County Department of Corrections Medical
Department ("Medical Department") and twelve officers
and employees at the Jail. Ross principally alleges that
the defendants failed to provide adequate medical care
for his sleep apnea; denied his Freedom of Information
Law ("FOIL") requests; falsified documents; retaliated
against him for the filing of grievances and this action;
and violated his right to medical privacy under the
Health Insurance Portability and Accountability Act of
1996 ("HIPAA"), 29 U.S.C. § 1182, the Fourteenth
Amendment, and state law.

1     Ross's allegations of violations of his right to medical
      privacy and HIPAA are contained in his opposition
      to the defendants' motion.

The defendants have filed a motion under F.R.C.P.
12(b)(6), to dismiss Ross's amended complaint. For the
following reasons, the motion is granted in part. The
claims against all the individual defendants are dismissed.

BACKGROUND
The following facts are taken from Ross's February 24,
2011 amended complaint or his opposition to the motion
to dismiss and assumed to be true for the purposes of
this motion. On August 14, 2009, Ross arrived at the Jail
and informed a Nurse Practitioner that he had recently
been released from Greenwich Hospital and suffered
from cardiomyopathy, high blood pressure, hypertension
and sleep apnea. Ross explained that he had had a
catheterization procedure to inspect the left side of his
heart for blockage because he had cognitive heart failure.
Ross provided the medical staff with a list of prescribed
medications.

*December 2009 Grievance and Lack of Treatment for*
*Sleep Apnea*
On December 5, Ross filed a grievance ("December
2009 Grievance") requesting a continuous positive airway
pressure machine ("CPAP") for his sleep apnea. Later
that day, he was examined by a Nurse Practitioner who
told him that he should see a doctor. On December 7,
Ross was seen by Dr. Goldberg and transferred from the
Special Housing Unit ("SHU") to the infirmary where he
was given access to an outdated bi-level positive airway
pressure machine ("Bi PAP").

On December 8, Sgt. Schmidt ("Schmidt") rejected Ross's
December 2009 Grievance as unsubstantiated. Ross
asserts that this decision was based on a report by Medical
Liaison June Yozzo ("Yozzo") that falsely stated that
Ross had previously refused to be housed in the infirmary
and to use the CPAP machine on August 14 and December
5, 2009.

On December 11, Sgt. Martinez ("Martinez") delivered to
Ross a memorandum from Warden Anthony Amicucci
("Amicucci") answering the December 2009 Grievance.
The next day, however, Martinez came back to retrieve the

memorandum, stating that Amicucci needed it back. Ross asked Martinez about a statement in the memorandum suggesting that he had previously refused the SHU. [2] Martinez told him not to worry about it because he had won his grievance.

[2]     The memorandum stated, " o]ddly the CPAP machine was offered to you again on the same day you filed your grievance. It would seem that the reemergence of your condition has coincided with your disciplinary problem that landed you in the SHU. It now seems that you are accepting the offer because you get relocated to the infirmary.

**\*2** After Martinez retrieved the original memorandum decision on the December 2009 Grievance, Ross requested a copy of the memorandum and was instructed by Martinez to fill out a FOIL request for copies of the grievance file. On December 11, Ross filed a FOIL request for the grievance file and on December 22, three dollars were deducted from his inmate account for the FOIL request.

On December 18, Sgt. Woods ("Woods") brought the appeal portion of the December 2009 Grievance to Ross and asked him if he still wanted to appeal. Ross indicated that he would like to appeal. Later that day, Sgt. Burligham brought back a copy of the memorandum but the language in it had been changed and Amicucci's initials were now omitted ("Altered Memorandum"). Ross was told that the Altered Memorandum had come from Captain Rhodes ("Rhodes").

On January 12, 2010, Captain Soychek ("Soychek") approached Ross and called him a "scammer" in the presence of Correction Officer Mack, who is not a member of the medical staff, and other prisoners, and "threaten[ed] [him] in a hostile manner." Soychek told him that he had faked his medical condition to get out of SHU "but he was going to make it his business to have [Ross] back in the SHU."

On January 17, Ross filed a grievance, number J 14 10 ("January 2010 Grievance") claiming that the memorandum responding to the December 2009 Grievance had been altered. Ross later accused Rhodes of tampering with the memorandum.

On January 20, Ross filed a FOIL request for his medical records. The fee was deducted from his inmate account on January 22, and he received the records on January 27.

That same day, Amicucci stated in response to Ross's appeal of the December 2009 Grievance, that he had been placed in the infirmary because of the medical staff's assessment of his medical condition, not because of the grievance he had filed. Ross claims that the defendants only provided him with treatment for his sleep apnea because he filed the December 2009 Grievance.

*February 2010 Grievance*
On February 16, 2010, Ross filed a grievance, number J 29 10 ("February 2010 Grievance"), concerning the denial of his FOIL request for copies of the file of the December 2009 Grievance. On February 22, Sgt. Del Treste ("Del Treste") informed Ross that his February 2010 Grievance was denied because he had not filed it within five days of the act or occurrence giving rise to the grievance. Ross told him that the February 2010 Grievance was based on a letter he had written to the cashier about not receiving the copies of the December 2009 Grievance.

Later that day, Ross had a conversation with Rhodes, who was accompanied by Yozzo, about the February 2010 Grievance. Rhodes asked why Ross was complaining, as he had already received his medical records. Ross explained that his February 2010 Grievance was not about the medical records, but about not receiving copies of the December 2009 Grievance file that he had paid for. Ross also asked Rhodes why he had altered the decision on the December 2009 Grievance, at which point Rhodes became hostile, started screaming and left.

**\*3** On February 23, Del Treste gave Ross an "addendum" stating that copies of his medical records were being provided to him as a courtesy. Ross informed him that his February 2010 Grievance did not concern the medical records and that he wanted a refund because he had been refused copies of his December 2009 Grievance file. Ross then asked Del Treste to read to him what the February 2010 Grievance was about, but Del Treste became extremely hostile and said "I don't have to do this shit I am not your Mother or Father." When Ross informed him that Ross's parents were deceased, Del Treste said he didn't care and called Ross a "dumb nigger." On February 24, Amicucci denied Ross's FOIL request.

Ross asserts that this was an attempt to cover-up the creation of the Altered Memorandum.

*March 2010 Grievance Concerning Bi PAP*
On March 18, Ross filed another grievance stating that he was experiencing difficulty breathing and sleeping at night in the infirmary ("March 2010 Grievance"). Ross claimed that the Bi PAP machine was outdated and the pressure setting, which had not been set by a medical technician or doctor during the three months he had been using the machine, was not working properly. Ross requested that his sleep apnea be tested with a Nocturnal Polysomnography, Oximetry or Portable Cardiorespriratory, and sought a referral to an otolaryngologist and a sleep study specialist to get a proper prescription for adjustment of the Bi PAP machine. Ross's grievance was denied.

*May 2010 Davis Visit*
On May 8, Ross's fiancée, Caroline Davis ("Davis"), attempted to visit Ross at the Jail. When she arrived at the entry point, she was harassed by Correction Officer Burges ("Burges"), who told her that Ross did not have a scheduled visit. When she informed him that the visit had been switched, Burges replied "Oh Ross that's the guy who hit the guy in the head with a chair. He is in I Block (Infirmary) faking like he got sleep apnea." When Davis attempted to leave money for Ross, she was told she could not leave money because Ross did not have a scheduled visit.

On May 12, Ross filed a grievance ("May 2010 Grievance") with Bell and wrote a formal complaint to the Department of Health and Human Services about the incident with Davis. On May 18, Sgt. Bell ("Bell") made false statements in his report about the incident with Davis. When Ross tried to submit a statement from Davis stating that she was harassed by Burges, Bell refused to accept it. Bell informed Ross that he had spoken to Sgt. Maccabee ("Maccabee"), who stated that Davis had refused to make a statement. Ross told Bell that was a "bold face lie" and that Davis had made several attempts to call someone at the Jail to complain but that she had been "given the run around." On May 20, Ross submitted a letter about these false statements to the Westchester County Executive's Office, the Westchester County Department of Health, the New York State Commission of Correctional Services, and the Department of Health and Human Services.

*June 2010 Efforts to Review Medical Records*
 **\*4** On June 28, Ross attempted to file another grievance concerning the refusal to allow him to review his medical records, but Woods refused to take it. Ross was also told that he could not review his medical records or get a sleep study number from the doctor's office. Ross complained to Block Officer Freeman, who filed the grievance in the infirmary log book.

On June 29, Ross filed another grievance with Sgt. Coley ("Coley") about the continuing failure to adjust the Bi PAP machine ("June 2010 Grievance"). Ross also complained that Yozzo had told him that he could not review his medical records without first paying for the entire medical file. Coley told him that he would take the June 2010 Grievance so that he would not get suspended. The next day, however, Coley returned the June 2010 Grievance and stated that Ross had previously grieved the same issue. Ross tried to explain that although the medical issues were the same, the Bi PAP machine was different and that he had the right to review his medical file. Coley became hostile and verbally abused Ross, saying he was a "fat piece of shit, who thinks [he's] a lawyer and that he would kick [Ross's] ass if their [sic] were not camera's [sic] watching."

*Ross Files Federal Lawsuit in May 2010*
On May 12, 2010, Ross commenced this lawsuit. The complaint was first served on several of the defendants on June 17. In an August 16 letter to the defendants, Ross requested permission to amend his complaint. Ross was directed to file an amended complaint by November 19. Ross did not file an amended complaint, and on January 13, 2011, the defendants moved to dismiss all claims in the complaint. On February 4, a pre-trial conference was held, and Ross was permitted to file an amended complaint. Ross filed the amended complaint ("Complaint") on February 24. The defendants then renewed their motion to dismiss, which became fully submitted on July 26.

DISCUSSION
"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' "

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

When considering a motion to dismiss under Rule 12(b) (6), a trial court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC,* 570 F.3d 471, 475 (2d Cir.2009). Moreover, pleadings filed by *pro se* plaintiffs are to be construed liberally. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949 50.

**\*5** Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940. In determining the adequacy of a complaint "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010).

In their motion to dismiss, the defendants identify four reasons why Ross's Complaint should be dismissed. They are that the Complaint fails: (1) to state a claim; (2) to allege that the defendants were personally involved in the alleged violations; and (3) to allege that Westchester County promulgated a policy or custom resulting in the violation of Ross's rights. They also assert that the individual defendants are entitled to qualified immunity.

A. Deliberate Indifference to Serious Medical Needs
Ross asserts a claim against Westchester County [3] for deliberate indifference to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights. [4] "There are two elements to a claim of deliberate

indifference to a serious medical condition: [t]he plaintiff must show that [he] had a 'serious medical condition' and that it was met with 'deliberate indifference .' " *Caiozzo,* 581 F.3d at 72 (citation omitted); *see also Hill v. Curcione,* 657 F.3d 116, 122 23 (2d Cir.2011); *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). Deliberate indifference is a mental state akin to "recklessness," and is measured using a "subjective test" that discerns whether the defendant was "actually aware of an excessive risk to an inmate's health or safety," *Caiozzo,* 581 F.3d at 69, and therefore "act[ed] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [5]

3        Ross named the Jail and the Medical Department as defendants. These defendants do not, however, have legal identities separate and apart from the County and, therefore, cannot be sued. *Jones v. Westchester Cty. Dep t of Corr. Med. Dep t,* 557 F.Supp.2d 408, 416 n. 4 (S.D.N.Y.2008).

4        The defendants represent that Ross was a pretrial detainee during the events in question. The Eighth Amendment does not apply to a pretrial detainee. *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). Nonetheless, " c]laims for deliberate indifference to a serious medical condition ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment. *Id.* at 72.

5        In his opposition to this motion, Ross asks the Court to consider the U.S. Department of Justice Investigation Report issued on November 19, 2009, regarding conditions at the Jail. "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint. *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006). Therefore, the report will not be considered in deciding this motion.

"As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 844 47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long

as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Hill,* 657 F.3d at 123 (citation omitted). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

Ross's allegations are sufficient to state a claim against the County for deliberate indifference to a serious medical need. Sleep apnea may be a life-threatening disorder. Ross alleges that it causes him to stop breathing while he sleeps. Ross also alleges that although the medical staff was informed about his sleep apnea when Ross arrived at the Jail on August 14, 2009, Westchester County failed to provide him any treatment for over three months and that the Bi PAP machine he was given on December 7, 2009, was not properly adjusted for his prescription. Ross does not seek to hold any individual defendant liable for these medical claims, rather he seeks to hold the County responsible for the deliberate indifference to his medical needs.

**\*6** Ross's remaining allegations regarding his medical treatment at the Jail, however, must be dismissed. His complaints that the Bi PAP machine he was given to use on December 7 was not a state-of-the-art machine, that he was not referred to an otolaryngologist or a sleep study specialist, and that his illness was not tested with specific kinds of tests, constitute mere disagreements with a course of treatment and fail to state a claim. *See Hill,* 657 F.3d at 123.

### B. Retaliation Claims

Ross alleges that the defendants retaliated against him for filing grievances and this § 1983 lawsuit by verbally threatening him on several occasions, harassing Davis when she attempted to visit him, and interfering with his ability to file further grievances. Ross has not alleged a retaliation claim.

To establish a First Amendment claim of retaliation, a plaintiff must show:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

*Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (citation omitted). Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which these claims of retaliation may be fabricated," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted).

In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted).

In order to satisfy the causation requirement, a plaintiff must allege facts suggesting that the protected conduct "played a substantial part in the adverse action." *Dawes,* 239 F.3d at 492. "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 558 F.3d at 129.

**\*7** It is undisputed that Ross has satisfied this first prong of a retaliation claim. The First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits.[6] *See id.* As described below, however, Ross's pleadings do not allege conduct on the part of individual defendants that rises to the level of adverse action.

[6]    To the extent any of Ross's retaliation claims are premised solely on the filing of this lawsuit, however, all those acts of retaliation that are alleged to have occurred before June 17, 2010, must be dismissed. Ross alleges multiple acts by the defendants that occurred between January 12, 2010 and June 30, 2010. Ross filed this action on May 12, 2010, and first served it on a defendant on June 17, 2010, well after most of the alleged retaliatory acts had taken place.

The threats and hostile comments that Ross alleges were made by Soychek, Del Treste and Coley are insufficient to establish a constitutional violation.[7] Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim. *Morales v. Mackalm,* 278 F.3d 126, 131 32 (2d Cir.2002) (calling prisoner a "stoolie" in the presence of fellow inmates), *abrogated on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Dawes,* 239 F.3d at 493 (calling a prisoner a "rat" or "informant"); *see also Davis,* 320 F.3d at 353; *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (rudeness and namecalling). Ross does not allege threats and comments by these three defendants that were direct and specific enough to deter a prisoner from exercising his First Amendment rights. *See Gill,* 389 F.3d at 381.

[7]    Although Ross claims that Rhodes was hostile and screamed at him, Ross does not allege that Rhodes did so with a retaliatory intent.

Ross's claims of retaliatory conduct by Burges also fail to satisfy the adverse action standard. Ross alleges that Burges divulged his sleep apnea condition to Davis, "harassed" her when she attempted to visit Ross at the jail, and prevented her from seeing him or making deposits in his commissary account asserting, erroneously, that her visit was unscheduled. Burges's alleged disclosure of Ross's sleep apnea condition does not constitute an adverse action because, as discussed below, sleep apnea is not an intimate or shameful condition whose disclosure is likely to result in acts of discrimination or intolerance. Likewise, even if Burges's alleged harassment of Davis

could be construed as an indirect effort to deter Ross from exercising his First Amendment rights, as noted above, such stray remarks do not satisfy the adverse action requirement. *See Morales,* 278 F.3d at 131 32. Nor can it be said that the one occasion on which Burges prevented Davis from visiting Ross or making deposits into his commissary account constituted conduct "that would deter a similarly situated individual of ordinary firmness from exercising his [ ] constitutional rights." *Davis,* 320 F.3d at 353. Ross does not allege that Burges regularly denied him visitations or that the isolated incident involving Davis resulted from bad faith rather than from an innocent misunderstanding regarding the date for which her visit had been scheduled.

Ross's retaliation claim against Bell fares no better. Ross asserts that Bell authored a report that falsely stated that Davis never sought to make a complaint. It is true that the filing of a false report may be actionable if made in retaliation for a prisoner's exercise of his constitutional rights. *Gill,* 389 F.3d at 380; *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Bell's alleged actions, however, are simply *de minimis* and fall outside the ambit of constitutional protection. *Davis,* 320 F.3d at 353. Ross does not articulate any particular harm that he suffered as a result of Bell's actions that would likely deter a similarly situated person of ordinary firmness from continuing to file grievances.

**\*8** Ross's remaining retaliation claim[8] is against Woods for refusing to file a grievance that Ross submitted to him on June 28, 2010.[9] The refusal to file a single grievance is, without more, insufficient to constitute an adverse action. A refusal to file a single grievance is not the kind or retaliatory act which deter a prisoner of "ordinary firmness" from filing other grievances. *Id.*

[8]    Although Ross alleges that Yozzo denied him his right to review his medical file and Sgt. Coley returned his June 2010 Grievance, Ross does not allege that Yozzo and Coley acted with retaliatory intent.

[9]    Ross asserts in his opposition to the motion to dismiss that the Jail has failed to maintain an adequate detainee grievance system. To the extent Ross seeks to raise a standalone claim based on the prison grievance process and its failure to properly investigate his grievances, it must be dismissed. A claim of violation of a state grievance procedure is not cognizable under § 1983 because prison grievance procedures are not

constitutionally mandated. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991) (per curiam).

### C. False Statements in Documents

Ross alleges that defendants Amicucci, Rhodes, Yozzo, Bell and Maccabee created documents containing false accusations and statements. A prisoner has no "general constitutional right" to be free from false accusations. *Boddie,* 105 F.3d at 862. To violate a plaintiff's constitutional rights, "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.* The claims based on the assertion that certain defendants created reports with false statements are therefore dismissed.

### D. Denial of FOIL Request

Ross claims that the defendants improperly denied his FOIL request for copies of the December 2009 Grievance. This is construed as a claim that Ross was deprived of property without due process of law. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation omitted).

Ross does not have a property interest in obtaining documents under FOIL. *See Papay v. Haselhuhn,* No. 07 Civ. 3858(LAP), 2010 WL 4140430, at *7 (S.D.N.Y. Oct.21, 2010); *O'Bradovich v. Village of Tucahoe,* 325 F.Supp.2d 413, 432 (S.D.N.Y.2004). FOIL documents are not produced as of right but only after request and investigation by the state entity. *See* N.Y. Pub. Off. Law §§ 84 89. A plaintiff therefore has only an expectation of receipt of such documents. *See O'Bradovich,* 325 F.Supp.2d at 432 33. Because Ross has no property interest in the FOIL documents, the defendants' failure to provide the requested documents does not constitute a violation of Ross's constitutional rights.

Even if Ross had a constitutionally protected interest in obtaining documents pursuant to FOIL, his due process claim would still fail. Whether or not the denial of his FOIL request is considered "random and unauthorized," *Rivera Powell v. New York City Bd. Of Elections,* 470 F.3d 458, 465 67 (2d Cir.2006), New York's Article 78 procedures constitute an adequate postdeprivation remedy for an alleged FOIL violation. *See Harris v. Mills,* 572 F.3d 66, 76 (2d Cir.2009).

### E. *HIPAA and Medical Privacy Claims*

Ross alleges that the defendants violated HIPAA and his right to medical privacy by improperly disclosing his medical information. Ross bases his claims on three alleged disclosures: Soychek's discussing his medical condition in the presence of another correction officer and other prisoners and calling him a "scammer"; Rhodes's and Yozzo's discussing his medical condition; and Burges's assertion to Davis that Ross was "faking like he got sleep apnea."

**\*9** Although HIPAA generally provides for the confidentiality of medical records, 42 U.S.C. §§ 1320d 1 to d 7, an individual cannot sue for its enforcement or for damages caused by disclosures. *See Acara v. Banks,* 470 F.3d 569, 571 (5th Cir.2006); *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d 371, 377 (S.D.N.Y.2009) (collecting cases). Only the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action. *See* 42 U.S.C. § 300gg 22. Therefore, Ross's HIPAA claim against Soychek, Rhodes, Yozzo and Burges is dismissed.

Nor can Ross convert this claim into a claimed violation of his constitutional rights. The Fourteenth Amendment Due Process Clause protects prisoners from the unwanted disclosure of certain medical information. *See Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.,* 631 F.3d 57, 63 64 (2d Cir.2011). A prisoner's right of privacy varies depending on the medical condition. Greater protection is afforded to conditions that are "excruciatingly private and intimate in nature," such as HIV status and transsexualism. *Id.* at 64 (citation omitted).

Ross's claims regarding the disclosure of his sleep apnea do not state a constitutional violation. Sleep apnea is not an intimate or shameful condition that may expose those who suffer it to discrimination and intolerance. Ross's medical privacy claim against Soychek, Rhodes, Yozzo and Burges is therefore dismissed.

Finally, Ross alleges that the defendants violated Public Health Law § 2780 by disclosing his medical condition. N.Y. Public Health Law §§ 2780 2787 sets forth a comprehensive scheme for dealing with HIV and AIDS related information. Because Ross does not bring a claim based on those conditions his Public Health Law § 2780 is dismissed.

### F. Personal Involvement

The defendants further argue that Ross fails to provide sufficient factual support showing the defendants' personal involvement in any constitutional wrongdoing. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone,* 634 F.3d 642, 644 (2d Cir.2011) (citation omitted). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Accordingly, it is "well settled" that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). When it comes to claims of deliberate indifference to serious medical needs, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

**\*10** The only claim that has survived the motion to dismiss is the claim against Westchester County for deliberate indifference to Ross's medical needs. Ross does not allege that any of the individual defendants had any part in the failure to provide him medical treatment for his sleep apnea for three months and the improper calibration of the Bi PAP machine he was given on December 7, 2009. The claims against each of the individual defendants are therefore dismissed.

### G. Municipal Liability

Finally, the defendants argue that Ross has failed to allege a municipal policy or custom to support the remaining deliberate indifference to medical need claim against Westchester County. "Section 1983 'imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights.' " *Okin v. Village of Cornwall on Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.

*Id.* (citation omitted). Municipal liability may spring from a single action. *See, e.g., Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004).

Ross has alleged facts sufficient to state a claim of municipal liability. He alleges that the Westchester Department of Corrections medical staff does not have an adequate system to identify prisoners with medical needs and make sure they are properly treated. Ross has asserted that this defendant did not treat his sleep apnea for over three months and that the Bi PAP machine he was given on December 7, 2009, was not properly adjusted for his condition. These are plausible claims of deliberate indifference to his serious medical needs. Ross's allegations are therefore sufficient to sustain his claim of deliberate indifference to his medical needs against Westchester County.

### CONCLUSION

The defendants' June 6, 2011 motion to dismiss is granted in part. All of the claims against the individual defendants are dismissed. Ross's claims based on retaliation, the creation of documents with false statements, the denial of FOIL requests, and HIPAA and medical privacy are dismissed. The motion to dismiss Ross's claim of inadequate medical care against Westchester County is denied to the extent described herein. The Clerk of Court will amend the caption to add Westchester County and remove Westchester County Jail and Westchester County Department of Corrections Medical Department as defendants.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 86467

**End of Document**                                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5178354
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Christopher ROSS, Plaintiff,

v.

WESTCHESTER COUNTY, Defendant.

No. 10 Civ. 3937(DLC).
|
Sept. 16, 2013.

**Attorneys and Law Firms**

Christopher Ross, Coxsackie, NY, pro se.

Robert F. Meehan, Christine Lynne D'Alessio, Westchester County Attorney's Office, White Plains, NY, for defendant.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff Christopher Ross ("Ross"), proceeding *pro se,* filed this action pursuant to 42 U.S.C. § 1983 for injunctive relief and to recover compensatory damages for a series of alleged constitutional violations that he suffered in connection with his medical treatment while incarcerated at the Westchester County Department of Correction ("WCDOC") between August 14, 2009 and August 3, 2010. Following a motion to dismiss, the action currently consists of one claim against defendant Westchester County ("County"), alleging that the County acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. On October 10, 2012, the County filed a motion for summary judgment. For the following reasons, the defendant's motion is granted.

BACKGROUND
The following facts are undisputed and taken in the light most favorable to the plaintiff unless otherwise indicated. On August 14, 2009, Ross was admitted to the WCDOC. Upon his admission, Nurse Practitioner Dorthy Day ("Day") conducted a medical intake examination, during which Ross informed Day that he had recently been

released from Greenwich Hospital and suffered from cardiomyopathy, high blood pressure, hypertension, and sleep apnea. Ross explained that he had had a catheterization procedure to inspect the left side of his heart for blockage because he had cognitive heart failure, and provided the medical staff with a list of prescribed medications. According to Ross, Day inquired as to whether Ross used a continuous positive airway pressure machine ("CPAP") for his sleep apnea and whether he had brought it with him to the prison. CPAP is a type of therapy that uses a machine to help a person with obstructive sleep apnea breath more easily during his sleep.[1] Ross informed her that he did use a CPAP machine at home when he slept, but that he did not have his machine at the WCDOC. Ross testified that he did not specifically request a CPAP machine during his medical intake.

[1]    A CPAP machine increases air pressure in the throat so that the airway does not collapse when the individual breathes in. It consists of a mask attached to a machine and is typically worn only while sleeping. A CPAP machine is set to a particular pressure level, measured in centimeters of water (cm H2O), that regulates air pressure during an individual's inhalation.

According to WCDOC procedure at the time of Ross's incarceration, an inmate could only use a CPAP machine while housed in WCDOC's Infirmary. On the August 14 intake examination form, Day reported that "Inmate [Ross] refuses to go to I [nfirmary] Block and use our C PAP machine states he will be fine." Ross, however, testified that no one at the WCDOC offered to provide him with a CPAP machine or explained that he could only use a CPAP machine in the Infirmary. Ross was placed in general population housing.

On August 24, Ross was referred to a chronic care physician, Dr. Randy Goldberg ("Goldberg"), for his hypertension. Dr. Goldberg examined Ross and reviewed Ross's medical history and medications, including that Ross has sleep apnea. Dr. Goldberg's notes from August 24 indicate that Ross felt "[r]easonably well" that day.

Ross was seen by Dr. Goldberg and Dr. Gary Guo ("Guo") on multiple occasions in the following months in connection with his ongoing chronic medical issues, including hypertension, cardiomyopathy, and high blood pressure. Medical Progress Notes on these dates provide

some insight into how Ross described his condition to WCDOC medical staff at the time: the Progress Notes indicate Ross was "all right" on October 7; "all right" on October 20; "[b]asically well" on November 4; "okay" on November 18; and "feels well" on November 30. Ross, however, testified that he complained to medical staff at the WCDOC throughout those months about his sleep apnea and access to a CPAP machine. Ross also testified that he did not believe he could ask for a CPAP machine during his medical examinations with Drs. Goldberg and Guo because those visits were intended only to check his vitals and ensure his medications were stable.

**\*2** Ross filed a Sick Call Request form on September 28 seeking dental care related to a broken tooth. He saw a dentist on September 30. Ross claims that he mentioned his sleep apnea to the dentist but did not specifically request a CPAP machine during that visit because he did not believe a dentist was the appropriate doctor to ask for treatment unrelated to his teeth.

Ross was moved to the Special Housing Unit ("SHU") from general population on November 20 as a result of a disciplinary infraction. Ross was uncomfortable sleeping on a "concrete slab" while in the SHU and experienced difficulty breathing while sleeping. He spoke to a nurse about a CPAP machine upon his arrival in the SHU.

On December 5, Ross filed a grievance ("December 2009 Grievance") requesting a CPAP machine for his sleep apnea. Later that day, he was examined by a Nurse Practitioner and referred to Dr. Goldberg. That day, the WCDOC medical staff also obtained a release from Ross to access his medical records, and contacted Ross's former doctor, Dr. Yung, hoping to obtain Ross's past medical records with respect to his use of a CPAP machine, including the results of a 2006 sleep study that Ross took.[2]

[2]   It appears that Drs. Goldberg and Guo attempted to contact Dr. Yung and receive Ross's records on several occasions on and after December 5. It is not clear from the record that Dr. Yung ever responded to either doctor.

On December 7, Ross reported symptoms of sleep apnea, including "poor sleep" and "gurgling and choking" at night. He was examined by Dr. Goldberg that day and transferred to the Infirmary where he was given access to a bi-level positive airway pressure machine ("Bi

PAP").[3] Dr. Goldberg prescribed the setting for the machine at "I 10" for inhalation and "E 5" for exhalation. On December 8, Ross's December 2009 Grievance was rejected as unfounded.

[3]   A Bi PAP machine serves a similar function to a CPAP machine, but whereas a CPAP provides only one pressure setting, a Bi PAP provides two pressure settings: one for inhalation and one for exhalation. The dual settings aid breathing comfort by allowing an individual to exhale against a lower air pressure. The terms CPAP and Bi PAP are used interchangeably in the WCDOC medical staff records and are used interchangeably in this Opinion, as well.

Ross testified that he used the Bi PAP machine every day. There is no dispute that the machine was in working condition and was regularly monitored. Nurses in the Infirmary monitored Ross and his use of the Bi PAP machine, and reported that he used the machine at night and "slept well through the night using the CPAP machine." At times, several nurses recorded during their rounds that Ross was only using his Bi PAP machine intermittently, while others reported that Ross was "using C PAP machine at all times during the night while asleep."[4]

[4]   Nurses in the Infirmary documented occasions when Ross did not use the CPAP machine    referred to as occasions of "non compliance    including four days in January 2010, four days in February 2010, and four days in March 2010. Ross testified that at times he would pull the Bi PAP mask off in his sleep because he was experiencing discomfort due to the improper calibration of the machine.

The WCDOC medical staff "replaced and fitted" the headband to Ross's Bi PAP mask on January 2, 2010, after Ross had complained that the machine was "choking" him. The medical records from that day report that Ross "confirms good seal to mask." On January 30, the medical staff replaced Ross's mask a second time, after Ross had requested a mask in a smaller size. Ross testified that he complained nearly every day to "every nurse and doctor [he] could find" that the Bi PAP machine was incorrectly calibrated. WCDOC medical staff, however, frequently noted that Ross "slept well" and had "no complaints" for the nurses during their rounds around that time.

On March 18, Ross filed a grievance stating that he was experiencing "extreme difficulties breathing and sleeping at night" ("March 2010 Grievance"). Ross claimed that the Bi PAP machine was outdated, the pressure setting was not working properly, and that his mask was too tight. Ross's grievance was denied.

**\*3** On April 2, Ross told a nurse that he did not feel comfortable with the two sizes of masks he had been given for the Bi PAP machine. The nurse suggested that Ross ask his family to bring his own mask to him, since it had been custom fit. It is unclear from the record whether Ross ever received his mask from home or if he continued to use a mask that the WCDOC staff provided.

On June 16, Ross again complained about the settings on the Bi PAP machine. WCDOC medical staff attempted to reach Dr. Yung for "background information," but received no response, [5] and a member of the WCDOC medical staff from "respiratory" adjusted Ross's Bi PAP machine to its "former setting." On June 19, a nurse reported that Ross's Bi PAP was "at [his] bedside" and "there ha[ve] been no complaints [from Ross] with the adjustment made three days ago."

[5]     Both the County and Ross have provided as evidence an undated page of notes from a conversation held between WCDOC nurse Maria Nestro and an individual named Anthony at the sleep study department of Westchester Medical Center discussing the results of Ross's 2006 sleep study. Fax cover sheets also presented in evidence indicate that the conversation occurred around June 6, 2010. The notes indicate that Anthony told Nestro that a prescription for Ross's CPAP was "11 cm H2O  and that Ross was last seen in August of 2006. Anthony suggested that Nestro call Dr. Yung since he was the last doctor at the White Plains Hospital to see Ross as a patient. The medical records from June 16 indicate that the nurse asked Ross to speak to Dr. Yung's office at White Plains Hospital since she "did not know the question that needed to be asked  unfamiliar with the terminology of CPAP.  Dr. Yung did not call back.

On June 26, Ross complained that his CPAP was not working properly. An Infirmary nurse noted that they were still waiting for Dr. Yung to send over Ross's "numbers." On June 29, Ross was seen by Dr. Guo, who set his Bi PAP machine to "I[ ]6" and "E[ ] 4."

On February 13, 2012, Ross participated in a new sleep study diagnostic test for his sleep apnea at the Mount Vernon Hospital. [6] The 2012 sleep study found that Ross's "[s]leep architecture was abnormal (fragmented) and improved with effective CPAP" and that Ross had a "severely elevated" Apnea Hypopnea Index, which was based on the number of obstructive apneas he experienced throughout the course of the study. Other aspects of Ross's tests were considered "normal." It also found that Ross "responded well" to a CPAP pressure set at 15 cm H2O. The sleep study ultimately concluded that Ross suffered from "Severe Obstructive Sleep Apnea Syndrome," and recommended *inter alia* that Ross be treated with "nasal CPAP therapy at a pressure of 15 cm H2O whenever asleep."

[6]     As described below, on January 11, 2012, the plaintiff's claims regarding the denial of access to a CPAP machine and the subsequent improper adjustment of his Bi PAP machine survived a motion to dismiss.

## PROCEDURAL HISTORY

Ross commenced this lawsuit on May 12, 2010. Ross filed an amended complaint against Westchester County and several other individual defendants on February 24, 2011. Defendants moved to dismiss the suit on June 6, 2011. By Opinion and Order dated January 11, 2012, the Court granted the motion to dismiss with respect to all of Ross's claims except his claim against the County for deliberate indifference to serious medical needs based on the failure to provide him with a CPAP machine for several months after arriving at the WCDOC and the alleged improper calibration of the Bi PAP machine he received on December 7, 2009. *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at \*10 (S.D.N.Y. Jan. 11, 2012). On October 10, 2012, after the close of fact discovery, the County filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., and served Ross with a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment" pursuant to Local Rule 56.1. After an extension, Ross filed his opposition, and the County then filed its reply.

## DISCUSSION

**\*4** The County has moved for summary judgment on the plaintiff's remaining claim regarding the treatment Ross received for his sleep apnea. Summary judgment may not

be granted unless all of the submissions taken together "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456 (1992); *Holcomb v. Iona Coll.,* 521 F.3d 130, 132 (2d Cir.2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Rule 56(e), Fed.R.Civ.P.; *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). Only disputes over material facts "facts that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In considering the summary judgment motion, the Court liberally construes all submissions by the *pro se* plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). The application of this forgiving standard for *pro se* litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (citation omitted).

To sustain claims under 42 U.S.C. § 1983, the plaintiff must show that he was "deprived of rights, privileges, or immunities secured by the Constitution and laws [of the United States]" by a person acting under color of state law. *Burg v. Gosselin,* 591 F.3d 95, 97 (2d Cir.2010) (citation omitted); *see also Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) ( "Section 1983 is only a grant of a right of action; the substantive right giving rise to

the action must come from another source."). Therefore, "the first step in any § 1983 claim is to identify the specific constitutional right allegedly infringed." *Pabon v. Wright,* 459 F.3d 241, 252 53 (2d Cir.2006) (citation omitted). In addition, while § 1983 "imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights," *Okin v. Village of Cornwall on Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't of Soc.* Servs., 436 U.S. 658, 692 (1978)), a municipal entity is not subject to *respondeat superior* liability under § 1983. *Monell,* 436 U.S. at 691. Instead, "[t]o prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline v. Gallo,* 546 F.3d 95, 103 (2d Cir.2008).

**\*5** Ross principally argues that the County acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment on two occasions: (1) between August 14 and December 7, 2009, by failing to provide him with a CPAP or Bi PAP machine to treat his sleep apnea, and (2) after December 7, 2009, by failing to adjust his Bi PAP machine to the correct setting. The defendant contends that it is entitled to summary judgment in its favor because Ross has failed to offer any evidence demonstrating either that the County was deliberately indifferent to Ross's medical needs or that any such violation was caused by a municipal policy or custom.

### A. Eighth Amendment Violation

"There are two elements to a claim of deliberate indifference to a serious medical condition: [t]he plaintiff must show that [he] had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation omitted); *see also Hill v. Curcione,* 657 F.3d 116, 122 23 (2d Cir.2011). Deliberate indifference is a mental state akin to "recklessness," and is measured using a "subjective test" that discerns whether the defendant was "actually aware of an excessive risk to an inmate's health or safety," *Caiozzo,* 581 F.3d at 69, and therefore "act [ed] with a sufficiently culpable state of mind." *Hill,* 657 F.3d at 122 (citation omitted).

A prison official only has a "duty ... to provide reasonable care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). Accordingly, an inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Hill,* 657 F.3d at 123 (citation omitted).

With respect to the seriousness of a plaintiff's condition, when the challenged conduct is the deprivation of medical care for a period of time, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (citation omitted). Other factors relevant to the seriousness of a medical condition include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment" and "the presence of a medical condition that significantly affects an individual's daily activities." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citation omitted).

With respect to Ross's claim that the County failed to treat his sleep apnea for over three months after he was admitted to WCDOC, Ross principally argues that after he "explained his medical record" to the WCDOC medical staff, "they put [him] in general population and no one ever followed up." It is undisputed that Ross told the intake nurse on August 14 that he had sleep apnea, and that he was not provided with a CPAP machine from the time of his arrival until December 7, 2009. Ross also testified that his condition causes him to stop breathing, "choke," and "gurgle" while he sleeps. Ross testified that he experienced these symptoms while housed in general population. It is also not disputed that once Ross underwent a sleep study in February 2012, he was diagnosed with "severe" sleep apnea, and it was recommended that he be "treat[ed] with nasal CPAP therapy at a pressure of 15 cm H2O whenever asleep" to treat his condition.

**\*6** The County contends that the evidence demonstrates that the WCDOC provided Ross with thorough care throughout his incarceration, never denied him access to a CPAP machine, and that Ross actually refused a CPAP machine when one was offered to him. The County emphasizes that Ross did not request a CPAP machine until he was confined in SHU, and the use of a CPAP machine would require him to be released from SHU to the Infirmary. Finally, the County points out that as soon as Ross filed a grievance requesting a CPAP machine, he was promptly examined and within two days moved to the Infirmary and given a Bi PAP machine. The County's evidence, however, does no more than raise issues of fact to be resolved at a trial regarding its deliberate indifference.

While Day's intake report states that Ross "refused" to be housed at the Infirmary with a CPAP machine, Ross contends that he was never offered a CPAP machine upon intake or in the following months, and that he was initially "put" into general population housing instead of the Infirmary. It is also not clear that WCDOC medical staff ever explained to Ross that he needed to be housed in the Infirmary in order to receive access to a CPAP machine. Moreover, the fact that Ross was seen by Drs. Goldberg and Guo for his chronic care conditions on various occasions on August 24, 2009 and after, does not establish that Ross also received appropriate medical attention with respect to his sleep apnea for the first three months of his incarceration.

This record is sufficient to raise a material question of fact as to the County's deliberate indifference to treating Ross's sleep apnea between August 14 and December 7, 2009. The record makes clear that WCDOC medical staff was informed of his serious medical condition when he arrived at the hospital on August 14, 2009, but did not provide him with the device that allows him to breathe while sleeping until nearly four months later. It is not clear from the record that this response, for any length of time, was a "reasonable" or "adequate" manner to treat the plaintiff's condition.

By contrast, Ross has not successfully raised a question of fact sufficient to withstand summary judgment regarding the County's response to his complaints about adjusting his Bi PAP settings after he was moved to the Infirmary and provided with a machine on December 7, 2009. Ross contends that the WCDOC medical staff did not set his

Bi PAP machine properly, and that doctors did not run the tests necessary to determine a proper calibration to treat his sleep apnea effectively. [7]

[7]    The Court has already dismissed Ross's claims regarding the specific tests doctors at the WCDOC used to test his sleep apnea, finding that this claim constituted a mere disagreement with a course of treatment, which failed to state a claim. *See Ross, 2012 WL 86467, at \*6.*

The parties do not dispute that Ross complained about the settings on his Bi PAP machine. But Ross also does not dispute that, after he complained about experiencing discomfort using his Bi PAP machine, the WCDOC medical staff changed his mask on two occasions, and adjusted the settings on his Bi PAP machine at least twice. [8] It is also undisputed that the WCDOC medical staff attempted to contact Dr. Yung on several occasions between December 2009 and July 2010 for background information on Ross's condition and to ascertain the CPAP settings previously prescribed for Ross, but that Dr. Yung did not respond. While Nestro may have spoken to an individual at Westchester Medical Center about Ross, it is not disputed that, despite their efforts, the WCDOC medical staff could not retrieve Ross's 2006 CPAP prescription from his former treating physician. Accordingly, Ross's claim of deliberate indifference based on the County's failure properly to adjust the settings on his Bi PAP machine after December 7, 2009, is dismissed.

[8]    While Ross points to the fact that the "I 10/E 5 and "I 6/E 4 settings applied by the medical staff at the WCDOC were not the same as the 11 cm H2O CPAP setting that had been reported to Nestro by the Westchester Medical Center in early June 2009, the record does not indicate how an "I 10/E 5 or "I 6/E 4 Bi PAP setting relates to either an 11 cm H2O or the 15 cm H2O CPAP setting prescribed during his February 2012 sleep study. In any event, whether the prescription that Anthony reported to Nestro in June 2010 was similar to or different from the levels to which Ross's Bi PAP machine was set at the WCDOC is of no consequence. The 11 cm H2O CPAP setting prescribed in Ross's 2006 sleep study was not the same as the 15 cm H2O CPAP setting determined to be appropriate for Ross in his 2012 sleep study, and nothing in the record demonstrates that the Bi PAP settings utilized by Dr. Goldberg or other members of the WCDOC medical staff

who adjusted Ross's Bi PAP machine were medically improper or unreasonable.

**B. Municipal Policy or Custom**

**\*7** Having determined that a material question of fact exists as to whether the WCDOC medical staff's failure to treat Ross's sleep apnea for over three months violated the plaintiff's Eighth Amendment rights, Ross's claim against the County will only survive summary judgment if Ross has also demonstrated that a municipal "policy or custom" caused that violation. *Hartline,* 546 F.3d at 103. Ross has not made that showing.

Ross principally argues that the County medical staff does not have an adequate system to identify prisoners with medical needs and make sure they are properly treated, and asks the Court to infer a municipal policy from the WCDOC's handling of his individual case. Municipal liability may spring from a single incident in certain circumstances. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004). Where a plaintiff alleges that his rights were deprived by a "single tortious decision or course of action, the inquiry focuses on whether the actions ... may be said to represent the conscious choices of the municipality itself." *Id.* at 126. This is because "[t]he 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). As a result, a plaintiff must prove that the alleged deprivation "occurred as a result of a [municipal] policy rather than as a result of isolated misconduct by a single actor." *Reynolds v. Giuliani,* 506 F.3d 183, 207 (2d Cir.2007) (citation omitted); *see also City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 24 (1985) ("[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an ... unconstitutional municipal policy," or that such a "policy was attributable to a municipal policymaker."). To do so, the plaintiff must identify a municipal policy as "the moving force" that "actually caused" the constitutional violation. *Connick v. Thompson,* 131 S.Ct. 1350, 1358 n. 5 (2011) (citation omitted); *see Reynolds,* 506 F.3d at 207. *"Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local*

government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds,* 506 F.3d at 192.

Ross has not established that any County custom or policy caused the WCDOC medical staff's delay in providing him with a CPAP machine. While Ross attempts to argue that the failure of the WCDOC "to follow up" with his sleep apnea is evidence of a flawed system that routinely fails to identify and treat prisoners, he does not point to a single other instance of similar treatment   and certainly not to repeated examples of such treatment   in order to support a finding that a "pattern of misconduct" amounting to deliberate indifference to prisoners' medical needs existed in the County. *Id.; see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). Instead, the evidence shows that Ross received frequent medical consultations to treat his chronic care conditions; when Ross utilized the WCDOC's sick call procedure for a broken tooth, he received dental treatment promptly; when Ross filed a formal grievance complaining about his medical care on December 5, he was referred to a doctor and provided with a Bi PAP machine within days; and when he complained to a nurse on June 26 about his Bi PAP machine, Dr. Guo adjusted the settings on his machine soon after. As a result, no reasonable jury could find that "systematic deficiencies in staffing, facilities or procedures" made Ross's experience "inevitable." *Todaro,* 565 F.2d at 52. [9]

[9]    Ross's reliance on a 2009 Department of Justice report that detailed the findings of an investigation into conditions at the Westchester County Jail is unpersuasive. Ross does not provide the report in evidence, and in any event, the report did not find systematic problems with respect to the issues raised in this case. Insofar as the report describes any deficiencies in the medical grievance process at the Westchester County Jail, it refers only to inmates' ability to obtain grievance forms. Ross does not challenge his access to grievance forms, and it is clear that Ross both had access to and used grievance forms on a number of occasions while incarcerated.

**\*8** Ross also fails to establish that any constitutional violation was caused by the actions or omissions of any individual with policy-making authority for the County. There is no evidence suggesting that a County policymaker had notice of any delay in the provision of medical treatment to Ross or other prisoners, let alone that a policymaker in any way ordered, encouraged, or

ignored such conduct. *See Amnesty,* 361 F.3d at 125 26. Ross testified that he wrote letters and complained to "everybody inside ... [and] outside the jail" while housed in general population that he had not received a CPAP machine to treat his sleep apnea. [10] But Ross does not identify the individuals to whom or the dates on which he wrote, much less provide evidence of any such letters or complaints in opposing this motion for summary judgment.   Nor does Ross present evidence indicating that any individual within the WCDOC who knew of, or heard a complaint about, his sleep apnea had policy-making authority; or that a policymaker outside of the jail was ever aware of any such complaint. Ross also fails to raise a question of fact as to whether the need for corrective action or supervision was or should have been otherwise "obvious" to the County, or whether any individual   let alone a policymaker   failed to investigate or resolve Ross's situation as a result of a "deliberate choice" indicating indifference, *see Cash v. County of Erie,* 654 F.3d 324, 334 (2d Cir.2011), rather than "mere negligence or bureaucratic inaction." *Amnesty,* 361 F.3d at 128.

[10]    Ross testified, for example, that he wrote a letter to the President of the United States complaining about his medical treatment while housed in general population.

[11]    The only written records of Ross's complaints about his access to a CPAP machine submitted to the Court in conjunction with this motion for summary judgment are Ross's December 2009 Grievance and March 2010 Grievance, both of which were addressed promptly.

In sum, there is not sufficient evidence in the record for a jury reasonably to infer that a policy, custom, or practice, or the deliberate choice of any County policymaker, caused the WCDOC's failure to provide Ross with treatment for his sleep apnea for over three months. Ross's claim of deliberate indifference against the County is therefore dismissed.

## CONCLUSION

The defendant's October 10, 2012, motion for summary judgment is granted. The Clerk of Court shall enter judgment for the defendant and close this case.

2013 WL 5178354

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5178354

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.